**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| In re: ) | |
| ) | Case No.: 1.10-BK-11169-GM |
| JASON BRAUN ) | Chapter 7 |
| ) | (US Bankruptcy Court for the |
| Debtor ) | Central District of California |
| ) | San Fernando Valley Division) |
| JASON BRAUN ) | |
| ) | |
| Plaintiff ) | Adversary Proceeding No. 11-01529 |
| ) | (US Bankruptcy Court for the |
| vs. ) | Eastern District of Virginia) |
| ) | |
| SALLIE MAE, *et al.* ) | |
| ) | NOT TO BE PUBLISHED IN |
| Defendants ) | WEST'S BANKRUPTCY REPORTER |

**MEMORANDUM OPINION**

This matter came before the Court for a trial on the merits on September 18 and 27, 2012. Jason Braun, the Plaintiff, represented himself, *pro se*. The Defendants were present and represented by counsel.[1] The Plaintiff seeks a declaration that his student loans are dischargeable pursuant to the hardship discharge standard of 11 U.S.C. § 523(a)(8). For the reasons stated below, the Court will deny the Plaintiff's request for a hardship discharge of his student loans.

**Findings of Fact**

1.   Mr. Braun is 36 years old. He is single and has no dependents.

---

[1] Defendants Wells Fargo Bank and Diane Weil appear not to have been served with the Summons and Complaint, and have not appeared in the case. The Judgment Order to be entered pursuant to this Memorandum Opinion will be final as to Educational Credit Management Corporation (ECMC), California State University Northridge (CalState Northridge), and the U.S. Department of Education, pursuant to Bankruptcy Rule 7054 (Fed. R. Civ. P. 54(b)). The Debtor also sued the Board of Trustees of the California State University. For purposes of this opinion, The Board of Trustees of the California State University and CalState Northridge are treated as one party.

### A. Mr. Braun's Military Service

2. Mr. Braun served his country honorably in the U.S. Army. He started his military service in 1995. He was honorably discharged on June 22, 2002. During the course of his service, he received a number of commendations or awards, including the Army Commendation Medal, the Army Achievement Medal and the National Defense Service Medal with One Bronze Service Star. Pl.'s Ex. 1.

3. During the course of his service, Mr. Braun experienced a number of traumatic events. In 1995, while Mr. Braun was in basic training, an individual of the U.S. military opened fire on Mr. Braun and his colleagues. Mr. Braun was not injured in the incident but others were either killed or severely wounded. Because the perpetrator was a member of the U.S. military, Mr. Braun testified that this has caused him to have an inability to trust others.

4. On November 7, 2006, Mr. Braun was injured while on a night parachute jump. As a result, he suffered physical injury to his knee, and spent the next six months or more in traction. He was assigned a disability rating by the military, which entitles him to disability benefits (discussed below).

5. Mr. Braun's military disability rating is 38%. This rating is due to the injuries he sustained to his knee in the parachute jump and to the alleged worsening of Mr. Braun's allergies while in the Army.

6. Further, Mr. Braun asserts that one or more of his friends committed suicide while in the military.

7. Mr. Braun asserts that, as a result of these traumatic events, he is suffering from Post-Traumatic Stress Disorder (PTSD). He further asserts that his Attention Deficit Hyperactivity Disorder (ADHD), from which he suffered moderately before his military service,

was aggravated greatly by the trauma he suffered in the military. Mr. Braun has not received a disability rating related to his PTSD, nor for his aggravated ADHD.

### B. Glendale Community College

8. After his separation from the military, Mr. Braun attended Glendale Community College in California. He had two places of employment during this period of time, Professional Security Consultants and Larchmont Productions. Both were short-term positions.

9. Mr. Braun obtained an Associate's Degree from Glendale in June 2007. While at Glendale, he also worked a series of jobs, including employment with Dick Clark Productions, Ultimate Staffing (for only 1 day), Securitas (where he supervised other security guards), Base Camp Films (as an assistant baker for two months), and at AD Personnel (a temp agency).

10. At Securitas, which appears to be the longest of Mr. Braun's employers during this period of his life, Mr. Braun was responsible for training other guards. He came to have conflicts with a number of the guards, ultimately resulting in some sort of altercation which resulted in his termination.

11. Mr. Braun appeared to enjoy his position as an assistant baker. However, he resigned from the position, believing that the job was a "conflict waiting to happen."

### C. CalState Northridge

12. Mr. Braun then attended CalState Northridge, where he graduated in 2009 with a Bachelors of Arts degree in Cinema and Television.

13. During his studies at CalState Northridge, he was enrolled in a work-study program with the Department of Veterans' Affairs (the VA). While there, he got into a verbal altercation with another worker over the use of an editing bay, in which, by his own admission,

3

he "went nuclear," and cursed out his co-employee in front of everyone. As a result, Mr. Braun was terminated from this position.

14. Upon graduating from CalState Northridge, Mr. Braun was assigned a counselor at the California Department of Rehabilitation. Mr. Braun asserted that his first counselor did not really understand, or was not well connected in, the entertainment industry, which is where Mr. Braun wanted to focus his employment search. He filed a complaint, which resulted in his being reassigned to a new counselor. He had more success with his second counselor, who was able to find him a position with the Department of Interior, as an audio-visual (AV) specialist.

### D. The Department of Interior

15. Mr. Braun began his employment with the Department of Interior (Interior) in April 2010. This position was a very good find for Mr. Braun, especially after bouncing around several short-term jobs. The difficulty with this position was that the job was located in Albuquerque, New Mexico. This resulted in Mr. Braun being separated from his friends and support systems which were located in California. Mr. Braun found the adjustment highly difficult. In order to move to Albuquerque, Mr. Braun took out an "RFL" loan, which constituted an advance against his disability support payments.

16. Mr. Braun was assigned as an AV Specialist at the National Indian Programs Training Center, in Albuquerque. In this position, he was required to assist in the setup of AV systems for presentations by Interior personnel. He was not hired as an Information Technology (IT) specialist, yet he maintains that many of his assignments in fact involved IT tasks, for which he was not trained, and for which he did not have the skills to complete the task.

17. In Albuquerque, Mr. Braun was feeling more and more isolated and alone. Despite these difficulties, he received a generally positive Employee Performance Appraisal,

which rated his performance a 3.25, or "Fully Successful." Pl.'s Ex. 7. The Narrative Summary for Critical Element No. 3 (Strategic Focus: Customer-Centric Support/ Teamwork) states:

> Jason is a very energetic, vocal and assertive individual. These are quality traits to possess, however in a training environment focused on customer service these traits may be too overbearing for some customers. Though his intentions and thoughts are sincere, his actions and tone are read differently by others. I will work with Jason to insure he continues to rate within the fully successful area. Jason does fulfill customer requests in a timely manner.

*Id*. at p.5. The Court notes that this generally positive Performance Appraisal is dated as of October 29, 2010 – only a month before Mr. Braun was terminated from Interior.

18. Mr. Braun also received two Certificates of Appreciation for his work at Interior, in September and October 2010. Pl.'s Ex. 8.

19. Mr. Braun's employment with Interior was, like his previous positions, marked with conflict. He got into a verbal altercation over printer cartridges, where he says "tempers flared," though he left the room before the situation escalated. In June 2010, he got into a second incident, where he alleges that his supervisor "lost control of his actions," and humiliated and demeaned him in front of others. He says that he walked away from this incident, but he made a complaint about it. He further had an incident where he says that another employee disregarded Interior policy on computer security, but in the end, he had to "eat crow" and apologize, though he let his superiors know that, in his view, this "wasn't right."

20. Mr. Braun experienced additional difficulties with another Interior employee where he says that she scheduled two meetings with him, and failed to appear (one of which was on a Friday afternoon, the other on the following Monday). He complained to her that she acted unprofessionally in their exchanges about the scheduling of the meeting, and she made a complaint about him.

5

21. On November 23, 2010, after only seven months of employment, Mr. Braun was terminated from Interior. Pl.'s Ex. 13.

### E. Mr. Braun's Legal Cases

22. Mr. Braun has three legal cases pending. The first is the instant case for the discharge of his student loans with ECMC, CalState Northridge and the Department of Education.

23. His second pending case is against Interior for wrongful termination as a partially disabled veteran. He filed this case with the Equal Employment Opportunity Commission. One of the remedies Mr. Braun seeks is to be reinstated with Interior, along with accommodations for his disability.

24. Third, Mr. Braun has an appeal with the VA claiming his disability rating should be increased due to his PTSD and chronic adjustment disorder. Pl.'s Ex. 30.

25. Mr. Braun asserts that these three cases have consumed his time and his attention for the past 2 years. He further asserts that the three cases consume all of his available working hours, and that he is not able to look for employment while working on his three cases.

26. Mr. Braun has not submitted an application for employment anywhere since he was terminated from Interior in November 2010.

### F. Mr. Braun's Current Circumstances

27. Since his termination from Interior, Mr. Braun has moved back to Warrenton, Virginia, to live with his mother. He takes a series of medications for ADHD, PTSD, acid reflux, allergies and sleep apnea.

28. Mr. Braun currently has two sources of income. He receives $1,114 per month for Social Security Disability Income, and $389 per month for disability through the VA. He

does not pay income taxes on these amounts. The VA also provides him with continuing medical coverage, including a primary care physician and regular visits to mental health professionals.

29. When asked where he sees himself in five years or so, Mr. Braun candidly stated that, as things currently stand, he is unable to look beyond the next two years, i.e., beyond the resolution of his legal cases against ECMC, CalState Northridge, the Department of Education, Interior and the U.S. Army.

30. Having had the opportunity to observe Mr. Braun's demeanor for the better part of two days, the Court found him to be intelligent and well spoken. His case was well-organized. He is justifiably proud of his military service, yet apprehensive about the future. He has a great desire to return to California, though at present, his finances prevent him from doing so.

### G. The Status of Mr. Braun's Student Loans

31. Between April 2005 and January 2009 Mr. Braun received Stafford subsidized and unsubsidized student loans totaling $40,451.00. ECMC Ex. I. Furthermore, between April 2005 and January 2007, Mr. Braun executed Federal Stafford Master Promissory Notes to secure loans in the total amount of $12,000.00. Department of Education Ex. A. Finally, in 2008 and 2009, Mr. Braun received Perkins Loans totaling $5,145.00. CalState Ex. B.

32. At present, Mr. Braun owes approximately $50,907.25 in student loans, between ECMC ($32,134.97, ECMC Ex. I), CalState Northridge ($5,145, CalState Ex. I), and the Department of Education ($13,627.28, Department of Education Ex. A).

33. Mr. Braun has made some effort to repay the loans over the years. Notably, he paid between $52 and $55 per month on the loans that he took out when he was at CalState Northridge, from September 2010 through June 2011. He has not made a payment since then.

34. Finally, with respect to his loans, Mr. Braun has done minimal investigation of the options available to him. According to the Department of Education's witness, Ms. Hom, Mr. Braun is qualified to consolidate all his loans, which would make him eligible for either a Direct Loan Income Contingent Repayment Plan (ICRP) or an Income Based Repayment Plan (IBR). He made efforts to renegotiate his loans by calling Sallie Mae when Sallie Mae had control of the loans. He does not, however, seem to understand the IBR program and other similar programs well. In fact, Mr. Braun made much of the fact that neither ECMC, CalState Northridge, nor the Department of Education (nor Sallie Mae) had taken any steps to explain the various options available to him for any of these alternative repayment programs until shortly before the trial in this case.

## Conclusions of Law

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, and the Order of Reference of the U.S. District Court for the Eastern District of Virginia dated August 15, 1984. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I) (determination as to the dischargeability of particular debts). Venue is appropriate in this Court pursuant to 28 U.S.C. § 1409(a).

The issue before the Court is whether the Plaintiff can discharge his student loans under section 523(a)(8) of the Bankruptcy Code. The Plaintiff bears the burden of proof on all issues under Section 523 of the Bankruptcy Code. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). The standard of proof is a preponderance of the evidence. *Id.* More specifically, the Plaintiff has the burden of proof on each of the three prongs of the *Brunner* test, discussed below. *In re Frushour,* 433 F.3d 393, 400 (4th Cir. 2005) ("The debtor has the burden of proving all three factors by a preponderance of the evidence.")

Section 523(a)(8) of the Code provides that a discharge under sections 727, 1141, 1228 (a), 1228(b), or 1328(b) does not discharge an individual debtor from any debt:

> unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for—
>
> (A) (i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or
> (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or
>
> (B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual.

11 U.S.C. § 523(a)(8). This is known as the "hardship discharge" for student loans. There is no dispute that in this case, Mr. Braun's obligations to ECMC, CalState Northridge and the Department of Education are student loans within the meaning of section 523(a)(8).

In *In re Frushour*, the Fourth Circuit discussed the hardship discharge in the context of the importance of the availability of funding for student loans, noting:

> In enacting the undue hardship standard, Congress had to take into account the viability of the student-loan program. That program serves valuable purposes. It affords individuals in all walks of life the opportunity to obtain an education, and with it the mobility and financial stability that an education can provide. Indeed, without the program, many people would never receive any higher education, because their credit risks would preclude them from obtaining private commercial loans. *Brunner v. N.Y. State Higher Educ. Servs. Corp.*, 46 B.R. 752, 756 (S.D.N.Y. 1985), *aff'd*, 831 F.2d 395 (2d Cir. 1987). The program does not just give loan recipients such as Frushour the major benefits of a taxpayer-funded education. As history has shown, a well-educated society is critical to our general welfare and prosperity.

433 F.3d at 399.

The Fourth Circuit has adopted the *Brunner* test for the hardship discharge of student loans. *In re Frushour*, 433 F.3d at 400 (citing *Brunner v. N.Y. State Higher Educ. Loan Auth.*,

831 F.2d 395 (2nd Cir. 1987)). Under *Brunner,* the test for the discharge of a student loan is a three part test:

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for himself and his dependents, if forced to repay the loans;
> (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and
> (3) that the debtor has made good faith efforts to repay the loans.

*Brunner,* 831 F.2d at 396.

The Court will address each of the three prongs under the *Brunner* test.[2]

*1. Whether the Debtor Cannot Maintain, Based on His Current Income and Expenses, a "Minimal" Standard of Living for Himself, if Forced to Repay the Loans*

Mr. Braun receives approximately $1,500 per month in Social Security and VA Disability Income. He does not claim any dependents. The Defendants assert that, if forced to repay his loans, Mr. Braun can maintain a minimal standard of living because his monthly income exceeds his expenses. However, the debtor is currently living with his mother and is not paying any rent. If he were to pay a modest rent of $800 per month, he would have only $700 per month for food, gas, clothing and other basic necessities. In that event, Mr. Braun would not have sufficient income to pay his expenses and to make any meaningful repayment of his student loans at the same time. When Mr. Braun filed for bankruptcy, he was paying $850 per month in rent, and as a result, had a negative $558.80 in monthly net income. *Debtor's Schedules I & J*, Department of Education Ex. D, pp. 16-17.

The Department of Education argues that Mr. Braun does have the ability to maintain a minimal standard of living because, as discussed in part 3 below, he is eligible to pay $0 per

---

[2] The Court notes that the Ninth Circuit, where Mr. Braun filed his bankruptcy case, also has adopted the *Brunner* test for the discharge of student loans. *In re Craig*, 579 F.3d 1040 (9th Cir. 2009). Thus, the analysis would be no different under the Ninth Circuit case law.

10

month on his loans. However, this argument confuses the third prong of *Brunner* with the first. The test on the first prong is whether or not the Debtor can maintain a minimal standard of living if he were required to make monthly payments on his student loans, not if he is *not* required to repay his loans.

The Court finds that, Mr. Braun has met the first prong of *Brunner*. He would be unable to maintain a minimal standard of living if required to make regular monthly payments on his student loans.

> 2. *Whether Additional Circumstances Exist Indicating that this State of Affairs is Likely to Persist for a Significant Portion of the Repayment Period of the Loans*

The second prong of *Brunner* requires the Debtor to prove that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans. This factor has been described by the Fourth Circuit as the "heart of the Brunner test" and as a "demanding requirement." *In re Frushour,* 433 F.3d at 401 (citing *Brightful v. Pa. Higher Educ. Assistance Agency (In re Brightful)*, 267 F.3d 324, 328 (3rd Cir. 2001)). It necessitates a finding that a "certainty of hopelessness" exists. *Id.* The Fourth Circuit notes that "only a debtor with rare circumstances will satisfy this factor," citing such examples as "illness, disability, a lack of useable job skills, or the existence of a large number of dependents." *Id.* (quoting *Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler),* 397 F.3d 382, 386 (6th Cir. 2005)).

Here, the Court finds that Mr. Braun has not met his burden of proof. Mr. Braun is a 36 year-old individual, with a four year college degree. Other than some relatively minor (i.e., not disabling) issues, such as asthma and allergies, he is in good physical health. Mr. Braun presented his case cogently. He was well spoken and his thoughts were well organized.

Mr. Braun asserts that he struggles to maintain employment (as opposed to finding employment), and that those difficulties are due to his PTSD and his now-aggravated ADHD. However, Mr. Braun did not present any evidence in the form of testimony from his treating physician or an expert witness from which the Court could conclude that these conditions are disabling, in terms of his ability to function in an employment environment. Judge St. John of this Court has written an insightful opinion on the inability of debtors in student loan hardship cases to engage mental health professionals to testify as expert witnesses. *In re Burton*, 339 B.R. 856, 874 (Bankr. E.D. Va. 2006). At the same time, Judge St. John noted: "The majority rule is that substantial and credible evidence, such as corroborating evidence, must be presented for the debtor to sustain his burden of proof regarding his medical condition." *Id.*, *see also In re Triplett,* 357 B.R. 739, 743-44 (Bankr. E.D. Va. 2006) ("where a claim for discharge based on undue hardship is based on a student loan debtor's testimony, a court simply cannot make a discharge determination 'without some *corroboration of the medical conditions* and *how long they will persist*…. The testimony of the Plaintiff alone is not sufficient.'") (emphasis in original; citation omitted). Here, there has been no corroborating medical, psychiatric or therapy-based testimony that Mr. Braun's mental health condition is disabling in nature. The Court also notes that Mr. Braun's disability rating from the military is attributable to his knee problems only. He has not been assigned any disability rating based on his PTSD or his aggravated ADHD.

Further, under the second prong of *Brunner*, the state of affairs must persist "for a significant portion of the repayment period of the student loans." *Brunner,* 831 F.2d at 396. Whatever the repayment period here is (i.e., whether it is the initial repayment period of ten years, or some extended repayment period under an Income Based Repayment program), the Court cannot find that Mr. Braun's mental health conditions are likely to persist for that extended

12

period of time. This is because Mr. Braun has in effect, limited his own horizons. In his testimony and in response to the Court's questions, Mr. Braun candidly conceded that he is unable to see past the expected duration of his three court cases, approximately for the next two years. Since his termination from Interior to date, Mr. Braun has not applied for a single position of employment, anywhere.

All of this is not to minimize, nor to understate, the reality of Mr. Braun's difficulties and suffering. The Court heard his testimony and his arguments, and heard the pain in his voice and his despair about the future. The Court, as noted at the hearing, probably has a more optimistic view of Mr. Braun's future than Mr. Braun himself might possess. But, based on the evidence presented, the Court is unable to conclude that Mr. Braun's difficulties will persist for so long that he will be unable to repay his student loans at any time during the repayment period. The Court finds that Mr. Braun has not met the second prong of the *Brunner* test.

> 3. *Whether the Debtor has Made Good Faith Efforts to Repay the Loans or to Consider Alternatives*

Finally, the third prong of the *Brunner* test asks whether the Debtor has made good faith efforts to repay the loans. The Fourth Circuit has held that the Debtor's effort to seek out loan consolidation options that make the debt less onerous is an important component of the good faith inquiry. *In re Mosko*, 515 F.3d 319, 326 (4th Cir. 2008); *In re Frushour*, 433 F.3d at 402. In both *Mosko* and *Frushour*, the Fourth Circuit endorsed the Ford Direct Loan Consolidation Program.

There are two basic loan repayment options that might be available to Mr. Braun. The Income Contingent Repayment Plan (ICRP) is found at 34 C.F.R. § 685.209. Under this program, the amount payable by the borrower is the lesser of:

      (i)      The amount the borrower would repay annually over 12 years using standard amortization multiplied by an income percentage factor that corresponds to the borrower's adjusted gross income (AGI) as shown in the income percentage factor table in a notice published annually by the Secretary in the Federal Register; or

      (ii)     20 percent of discretionary income.

34 C.F.R. § 685.209(a)(2). The maximum repayment period under the ICRP is 25 years. 34 C.F.R. § 685.209(c)(4)(i). Interest that is not repaid during this period is capitalized (i.e., added to the loan balance). 34 C.F.R. § 685.209(c)(5). However, once the outstanding principal loan balance is ten percent greater than the original loan amount, interest continues to accrue, but is not capitalized. *Id.* The borrower is eligible for loan forgiveness after 25 years of complying with the plan. 34 C.F.R. § 682.215(f).

      The second option, the Income Based Repayment Plan (IBR), is found at 34 C.F.R. § 685.221. Under this program, the borrower's monthly loan payments are "limited to no more than 15 percent of the amount by which the borrower's AGI [Adjusted Gross Income] exceeds 150 percent of the poverty guideline applicable to the borrower's family size, divided by 12." 34 C.F.R. § 685.221(b)(1). The borrower is eligible for loan forgiveness after 25 years. 34 C.F.R. § 685.221(f). Information on the Income Based Repayment Program can be found on the Department of Education's web site at http://studentaid.ed.gov/repay-loans/understand/plans/income-based (last visited Oct. 17, 2012).

      On June 7, 2012, ECMC wrote a letter to Mr. Braun, explaining his options under the IBR program. ECMC Ex. J ("Given your gross monthly income ('AGI') of $376 from the Federal Government as your military disability and Social Security Disability Benefits of $1,114 and family size of one (1), you are eligible to repay your debt through the IBR program with an estimated payment of **$0 for 300** months.") (emphasis in original). At the trial, Mr. Braun did not appear to understand well the options that are available to him. His primary complaint was

that these options were not explained to him by Sallie Mae (which previously serviced a portion of the loans). When presented with these options on cross examination, Mr. Braun agreed that it might be a good idea to explore these options, but he expressed his exasperation at the fact that these options were only being explained to him now that he had reached the middle of the trial, not when he was considering his repayment options at the commencement of the case. The Court can understand Mr. Braun's frustration, but it does appear to the Court that there are options available to Mr. Braun that, to date, he has not fully explored.

The Court finds that Mr. Braun has not fully explored all of these options within the meaning of the third *Brunner* prong.

## Conclusion

For the foregoing reasons, the Court finds that the Plaintiff has not met his burden of proof under the second and third prongs of the *Brunner* test. The Court will enter a separate Order denying the Plaintiff's request for a discharge of his student loans as an undue hardship.


Date: _____                    _____
                                                 Brian F. Kenney
Alexandria, Virginia                             United States Bankruptcy Judge


Copies to:

Jason Braun
7381 Pembrooke Court
Warrenton, VA 20187
Plaintiff *pro se*

Educational Credit Management Corporation (ECMC)
Attn: Legal Department
P.O. Box 64909
Saint Paul, MN 55164-0909
Defendant

15

Board of Trustees of the California State University
Attn: Legal Department
P.O. Box 64909
Saint Paul, MN 55164-0909
Defendant

Rand L. Gelber, Esquire
One Church Street, Suite 802
Rockville, MD 20850
Counsel for Defendants Educational Credit Management Corporation and
California State University Northridge

Diane Weil
16000 Ventura Boulevard, Suite 1000
Encino, CA 91436
Defendant, *pro se*

Robert K. Coulter, Esquire
Office of the US Attorney
2100 Jamieson Avenue
Alexandria, VA 22314
Counsel for the United States